MEMORANDUM OF DECISION
On April 18, 1997, the Department of Children and Families (hereafter "DCF") filed petitions for the termination of the parental rights of David K. to his daughter, Carissa N., now age seven, and of Zegham K.[2] to his son, Joao D., now age four. The mother of the two children, Bunnie D., died of a suspected CT Page 6033 drug overdose on March 7, 1996, when the two children were already in foster care. On September 6, 1995, both children were committed to the care and custody of DCF as uncared-for children with specialized needs. Litigation concerning their custody had been commenced in the Probate Court in 1994 by David K. due to their mother's drug-addicted life style. He sought guardianship of both children as he was then thought to be the father of both children. Later testing excluded David K. as the father of Joao, after which Zegham K. was named as Joao's putative father. Ultimately, by Probate Court order, Bunnie D. and David K. shared joint custody with the children spending alternating weeks with each parent.
The family was first involved with DCF in 1993, when the children were briefly taken into custody as their mother's whereabouts was unknown and their father was intoxicated. They were returned after five days. The next and current involvement of DCF was due to the drug and alcohol problems of the parents, the mother's drug addicted lifestyle and in the fall of 1994, the allegations of sexual abuse of Carissa by her maternal uncle, Daniel D., disclosed by him during a therapy session and reported by his therapist.
The court finds that David K. was personally served with the petition for termination and has appeared through court appointed counsel. Service on Zegham K. was made by publication inThe Connecticut Post, a newspaper with general circulation in the Bridgeport, Connecticut area, where he was living. The court finds that proper notice has been given in accordance with the law. The court further finds, from the evidence provided by a DCF social worker, Tracy DeCerbo, that Zegham K. had actual notice of these proceedings through a telephone call he made in March of 1995 to inquire about Joao. At that time, he did not deny his possible paternity. Despite his initial inquiry, Zegham K. never attended court, sent letters or gifts or was otherwise a resource for this child. No counsel was appointed for Zegham K. as he has never expressed any further interest in his son. The court concludes that such appointment would serve no purpose. The court has jurisdiction in this matter and further finds that there is no pending action affecting custody of Carissa and Joao in any other court.
At trial, DCF proceeded against David K. on the grounds that his biological daughter, Carissa, had previously been adjudicated an uncared-for child and that he has failed to achieve such CT Page 6034 degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in her life. Connecticut General Statutes § 17a-112 (c)(3)(B). The other ground alleged was that this child has been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for her physical, educational, or emotional well-being. General Statutes § 17a-112 (c)(3)(C). Failure to rehabilitate as well as abandonment and the failure to have an on-going relationship with Joao were alleged against Zegham K. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), and (D). In addition to the DCF petitions, David K. had filed motions for revocation of the commitment of the children as well as a motion for transfer of guardianship of the children to his mother, Leigh C. Both motions were withdrawn at the conclusion of the trial.
1. FACTS
The court heard four days of testimony from the DCF social workers, the children's therapists, several foster parents, the social workers and a nurse involved in the interviewing of the children concerning the allegations of sexual abuse, Dr. John Leventhal, the petitioner's consulting expert regarding the sexual abuse of the children and Dr. Suzanne Sgroi, the expert retained by David K. The court received 25 exhibits into evidence. The court also took judicial notice of the prior proceedings involving the parties to this case and their children. David K. attended the trial and, through his counsel, vigorously contested the petition. The court notes that David K. was found to be the psychological parent of Joao in prior proceedings in the Juvenile Court and was awarded full party status in the termination proceedings for this child. (Sequino, J). His mother, Lee C., was permitted to intervene for dispositional purposes. The court makes the following findings and the reasonable inferences supported by those findings from the evidence presented at trial.
A. Grounds for Termination
 1. The biological father of Carissa and psychologicalparent of Joao, David K.
While the current involvement of DCF was precipitated by the guardianship application filed by David K. with the Probate CT Page 6035 Court, such involvement and the preparation of the mandated social study in that setting disclosed domestic abuse between the parents, alcohol and drug addiction as well as concerns about David K.'s ability to maintain adequate income and housing for the children. Referrals from the community occurred on repeated occasions in 1994 and on September 2, 1994, Carissa's maternal uncle spontaneously disclosed in a therapy session that he had oral sex with his niece. At the recommendation of DCF, David K. took Carissa to the Yale Sexual Abuse Clinic, where she was evaluated in November of 1994 and a medical examination was performed. He also took her to the East Haven Mental Health clinic for further treatment where she was seen by Dr. Adelman.
On January 27, 1995, DCF secured an Order of Temporary custody of both children (Sequino, J.) based on the chaotic living conditions at their mother's home, the alcohol and drug abuse of the parents as well as the father's unstable and inadequate living conditions. The children have remained in foster care since that date. When initially placed, Carissa and her brother had trouble adjusting to their placement, they were fearful and had frequent nightmares. Carissa did most of the talking; Joao, then two, communicated with grunts. To her foster parents, Carissa described the drugs her parents had used, told them about "roach clips" and how her parents had used drugs in explicit detail. She also described physical abuse, watching her parents have oral sex and domestic violence between her mother and her various partners.
(A) Sexual Abuse Allegations by Carissa
On March 29, 1995, after an overnight visit with her father, Carissa disclosed to the DCF social worker, Julie Citro, in the hearing of her foster father, that she had been sexually abused by her father.[3] She talked about her father making her bleed and that he threw away the underwear and also he told her not to say anything. She was taken again to the Yale Sexual Abuse Clinic. There, Ms. Freudenthal, the staff person who interviewed the child for the first time on April 11, 1995, testified that Carissa was cooperative and very verbal. The child described in detail that her father had put his penis in her vaginal area and that he also hurt her with a screwdriver. She again described the bloody underclothes and the admonition to not tell anyone. She was able to clearly distinguish between the events concerning her maternal uncle and the oral sex he had with her and the abuse perpetrated by her father. She also stated she was afraid of her CT Page 6036 father. Ms. Freudenthal concluded that it was highly probable that sexual abuse had occurred and that her father had abused her. She based her opinion on her four interviews with Carissa, the consistency and detail of the child's reports and her clear recall of events.[4]
On the basis of these reports as well as later allegations made by Joao, David K. was charged with sexual assault and in November of 1997, as a result of a plea bargain, he was convicted of risk of injury to a minor and was sentenced to three years imprisonment, execution suspended, with five years of probation. A further condition imposed was no contact with minors under the age of sixteen as well as his own children until the expiration of the five year period, in 2002. At the time of the termination trial, he was incarcerated on allegations concerning violation of the terms of his probation.
After her disclosure concerning sexual abuse, Carissa was interviewed numerous times, by the police, by Ms. Freudenthal and Dr. Adelman as well as Dr. Mayo, a psychiatrist at the Yale Child Study Center. Dr. Mayo's report[5] was to examine custody and placement issues involving both children, to which end he interviewed the parents, the children, the paternal grandmother and the DCF caseworkers familiar with the family's history as well as pediatric reports, David K.'s, treatment at the West Haven Mental Health Clinic, the Probate Court social study and reports prepared by the case workers. While Carissa retracted the allegations she had made against her father while interviewed by Dr. Mayo, nonetheless he concluded;
 "Of particular concern is Carissa's sexually precocious behavior and sexual acting out. She clearly has been over exposed to and overstimulated by sexual behavior and/or material. To what extent this could be solely attributed to the abuse by her uncle is not certain, but it is likely that there are other factors involved especially given the chaotic nature of her home. . . . . ."
He concluded as to David K.:
 "The children should remain in foster care until such time as Mr. K. has obtained steady employment and a home for himself and the children and become actively involved in treatment for his alcohol abuse and emotional problems. . . . . . Mr. K. will require extensive support and in-home services if this is to occur successfully. The process should be gradual and unrushed." CT Page 6037
Dr. Mayo understood the sexual abuse evaluation to be ongoing at that time and stated that:
 "If the sexual abuse evaluation shows that it is likely that either parents had sexually abused one of the children, then the children should not be placed in the custody of that parent."
At that time, six months after the children's removal from the home, Dr. Mayo did not believe that parental rights should be terminated and thought the children would benefit from continued supervised visits with their parents, which were continued.
Subsequent to the summer of 1995, Carissa again asserted the same allegations against her father. She never again retracted them as she had with Dr. Mayo. She disclosed the same information to Cheryl Jackish, her second foster mother from June of 1995 to March of 1997, to the DCF social worker, Tracy DeCerbo, briefly in August of 1996, to her present foster mother, to Iris Slotkin, her psycho-therapist from September of 1995 to June of 1996 as well as to her present therapist, Dr. Thomas Blair. To Ms. Slotkin, Carissa stated in the fall of 1995 that her "father put something in her privates and hurt her and made her bleed." Ms. Slotkin stated that she found the child believable as she was consistent with her remarks. She also stated that she did not spend a great deal of time talking about this in her treatment of the child. She did feel very strongly that Carissa needed permanency as at the time she concluded her treatment, Carissa had been in foster care for over two years. She was concerned about the lack of progress both parents had been making in the various treatments and programs to which they had been referred.[6]
The precocious sexual behavior and the sexual acting out of both children continued in their first foster home placement. Carissa inappropriately sexually touched her brother and acted out with other children of her own age, her first foster father reported. This behavior became worse over time and Carissa was moved to another foster home, while Joao remained in the first home. She was a difficult child to handle, oppositional and continued to act out sexually. After a year, she was briefly returned to the first foster family and reunited with Joao, and then in July of 1997, placed in her present home, where she is thriving. Her current foster parents wish to adopt her. CT Page 6038
(B) Sexual Abuse Allegations by Joao
In December of 1996, Joao for the first time explicitly disclosed after a supervised visit with David K. that David had touched him on his "pee-pee" in the front and on his "butt". The event, he claimed, occurred while he was in the kitchen within earshot, if out of sight, of the DCF social worker, Carissa and Carissa's grandmother, Lee C., who like David K., views Joao as a member of her family and her grandchild as well as Carissa. The child, at that time, made no comment nor did he do so while Tracy DeCerbo, the DCF worker, was transporting him back to the foster parents. He made the allegations later at the foster home when his foster mother confronted him about his sexually acting out with another foster child in the home.
Joao, too, was interviewed numerous times concerning the allegations he made. Initially he was seen by a member of the child protection team at St. Raphael's Hospital, Gloria Greenidge, a clinical pediatric social worker. She interviewed him alone and, she stated "he was able to describe what happened to him." He demonstrated where he was touched for her in the front and the back by "Daddy Dave". Joao was then four years old. The report prepared by her and another member of the team, Stephanie Perkins, a nurse practitioner, outlines the conclusions reached. Ms. Perkins noted that:
 "His disclosure is clear and concise, and consistent with those statements made to his DCF worker and foster mother. His occasional sexualized behaviors are concerning and consistent with a history of sexual abuse. . . . . Given his consistent disclosure as well as the sexualized behavior towards other foster children in the home, I am highly suspicious of sexual abuse at some point in time."[7]
Joao had mentioned sexual abuse before, his foster mother reported, but not so explicitly. Also his sister, Carissa, had on several previous occasions, including in her statements in March of 1995, said that her father had also molested Joao. But it was not until his independent disclosure in late 1996 that Joao was interviewed. As a result of this evaluation, the team recommended that Joao continue with the counseling he was then receiving with Ms. Michelle Brownstein and supervised by Ms. Shallis at the Milford Mental Health Clinic. Ms. Joyce Shallis testified about Joao's therapy sessions and one session in May of 1997 which she conducted personally. In her independent session with him, the CT Page 6039 child briefly mentioned that his daddy touched him on his buttocks and penis and that it made him feel bad and angry. She described an emotionally needy little boy in therapy during that year; his behavior and play demonstrated themes of aggression and abandonment, betrayal and loss over and over again. She found him to be depressed and fearful and diagnosed him as suffering from post traumatic stress disorder. She testified that the statements he made were very much consonant with the themes he demonstrated in play. She, too, found the child's statements consistent and credible.
After the conclusion of his therapy at the Milford Clinic, Joao was not again in therapy until December of 1997 when he began treatment at the Child Guidance Clinic in Meriden. There he has been seen weekly by Ms. Werneck, a clinical social worker intern. She testified that Joao was "a very needy little boy who carried a lot of baggage with him; he was exposed to parental substance abuse, had been rejected by his mother and it also appeared to him that he had been rejected by various foster homes." She concluded that "Johnny" was sexually abused. She also strongly believed him to be in need of permanency now. She stated: "It is time for him to have a stable home life with nurturing parenting in a safe environment where he can continue with the treatment he needs."
(C.) Conclusions of the Consultants
These proceedings have involved extensive litigation concerning the sexual abuse allegations made by both Carissa and Joao, both during the trial and during prior hearings concerning issues of visitation of David K. with the children. Those allegations and the court proceedings which resulted have impacted the visitation permitted David K. Initially there was unsupervised visitation, followed by supervised access which ended in December of 1996 with the entry of the criminal court order for no contact after David K. was arrested for sexual assault on December 16, 1996. David K. has had no visitation with the children since that time. In November of 1997, the final orders were entered in the criminal case then pending against David K. in connection with these allegations, as previously outlined. All of the witnesses who had direct contact with the children concerning their allegations and who testified at trial believe that it is highly probable that Carissa was abused by her father. As to Joao, they believe that the abuse he reports is more probable than not to have occurred, but are less clear as to CT Page 6040 the weight to be given to the child's allegations.
Both the petitioner and David K. retained expert consultants to evaluate the many reports and differing disclosures made. Dr. John Leventhal, a pediatrician, director and founder of the Yale Sexual Abuse Clinic and professor of pediatrics at Yale University Medical School, was qualified and accepted as an expert in child development and child sexual abuse. He reviewed the extensive case materials regarding Carissa and Joao that included, but were not limited to, the reports of the Yale Sexual Abuse Clinic, St. Raphael's Hospital, the reports of Dr. Adeleman and Dr. Mayo as well as those of the various other treatment providers, and other materials relevant to the issues in this case. Initially in 1997, Dr. Leventhal was consulted and testified regarding visitation and then more recently he was asked questions concerning the permanency needs of these children. His opinions were based on his review of the voluminous materials as he never met with either of the children. He concluded, based on his review and his experience in the field, that it is highly probably that Carissa was sexually abused by her father. Some of the variety of factors which led him to that opinion are her consistency of reporting the events over time and her ability to clearly distinguish what her maternal uncle did to her and what had happened with her father. His opinion as to Joao was more qualified. He stated at trial that "it is harder to be as certain whether Joao was sexually abused by David K." Nonetheless, Dr. Leventhal believed that it was very likely that Joao, too, had been so abused.
His opinion as to whether or not the biological fathers' parental rights to the children should be terminated was unequivocal. He stated that a permanency plan should be developed as soon as possible for both children. There were four main reasons for his conclusion, he testified; the first of which was the sexual abuse of the children. The second reason was that the "children in their early years grew up in chaotic and sometimes violent, unsafe and certainly neglecting settings. The father was in part responsible for those settings." He continued, "Carissa and Johnny suffered because of the inadequacies of nurturing and they sustained serious losses and separation. They suffer from neediness and for children with these issues, consistency and permanency are critical." The third reason was that "Mr. K. had been unable to follow through with the critical interventions allowed him, he had not completed alcohol treatment and sexual abuse counseling related to parenting. These were critical issues CT Page 6041 for him" Dr. Leventhal stated. The fourth main reason the children are in need of permanency is an issue of time. "Both children have been in foster care since January of 1995. David K. has had no involvement with them since December of 1996 and now there is a no contact order until the fall of 2002, entered in the criminal matter. Carissa will be eleven and a half years old then and Johnny ten. Neither child can wait that length of time," he concluded.
In contradistinction to the unequivocal opinions of Dr. Leventhal, Dr. Suzanne Sgroi expressed serious reservations about the veracity and believability of the allegations made by the children. She, too, reviewed, extensive case materials and was qualified as an expert in the evaluation of sexual abuse allegations and of victims and offenders. Her work in this area of specialization is well known and respected. In her review of the case, she met with Dr. Leventhal before his testimony in October of 1997 and attended his deposition. She, too, did not interview the children, having determined that it was not in their best interest to be interviewed yet once again.
Her testimony highlighted the troubling issues raised in this matter and indeed in many cases involving sexual abuse allegations made by young children. First, there is the issue of multiple interviewing by many individuals with differing skill levels and training concerning the delicate and sensitive business of questioning children, whose emotional and cognitive world has not yet matured to adult levels of focus on cause and effect and rational explanations. The multiple interviewing raised concerns about contamination, suggestions made by less skillful and leading questions and of the "rehearsal effect." Having once made a disclosure and then repeating it many times to different people not necessarily well-known to the child, it is then not clear whether a child is recalling actual events or remembering previous disclosures of those events. Dr. Sgroi stated that preschool children are demonstrably more susceptible to these effects than school age children because of their limited age and limited verbal and conceptual ability. The court also notes that there is also the very real and poignant way in which children are preternaturally alert to the emotional clues they receive from the adults around them and the ways in which their responses are based on their own internalized expectations about what those powerful adults are seeking.
Dr. Sgroi highlighted the fact that the initial allegations CT Page 6042 made by Carissa against her father surfaced at a time when David K. and the child's mother were feuding over custody. This fact, in her opinion, presented one more reason to be skeptical about the validity of the allegations. She noted that during this time, the "child is being exposed to each parent's statements to the child about these events and being exposed in general about what the adults are saying about the absent parent." As to Joao's allegations, she found nothing credible about them. She stated that to have "these allegations surfaced in the context of repeated sexual acting out and repeated limited setting by the adults and her own knowledge that one of the ways in which adults deal with this troubling behavior in young children is by believing that children have learned this behavior from sexual abuse by adults."
Dr. Sgroi also made an important distinction between investigation of sexual abuse allegations for forensic purposes and for treatment purposes. She testified that for forensic purposes, she required some corroboration of the allegations from a source other than the child. Using this criterion, she concluded that only the allegations concerning Carissa's maternal uncle were believable as they were corroborated by the perpetrator. While it may be desirable to have such corroboration and certainty, given the secretive and highly emotionally charged nature of sexual abuse, it is the rare circumstance where independent corroboration is available. Adults in a position to provide such information often are the ones with the most to gain by destroying any physical evidence, by pledging the child to secrecy and by insisting that the child is lying and cannot be trusted to tell the truth. In short, they are the perpetrators themselves who have the power and control to hide all evidence of their crimes and often to repeat those crimes for years without detection. If the legal requirements were as Dr. Sgroi believes necessary for investigative purposes, far fewer individuals would be apprehended, convicted and prevented from repeating their sexual abuse of children in their care.
Dr. Sgroi also did not see the consistency of the statements Carissa and Joao made as evidence of the truth of their allegations. She attributed this to the rehearsal effect previously mentioned and to "performance expectations" which children develop with multiple retelling of their stories. She believed these factors further weakened their credibility. When questioned about the evidence from a treatment perspective, she stated that the children were exposed to a great deal of adult sexual interaction when the abuse allegations arose. There was no CT Page 6043 doubt in her mind that they were sexualized children and that their sexual acting out behavior was due to the traumatic impact of adult sexuality on them. "Because of all the compounding factors", she testified, "it is difficult to specifically identify the shape of the sexual trauma."
Dr. Sgroi expounded about her preference for video-taped or at least audio-taped interviews, which were not performed with these children. She stated that it is extraordinarily difficult, if not impossible, to take accurate notes of the questions asked, a child's answers and to also observe closely a child's reaction to the entire procedure. "With an articulate child, one simply cannot keep up. Children often say things when they are not facing you, they speak cryptically and sometimes they do not respond at all". She stated that her skepticism of the initial interviews of Carissa as reported by Ms. Freudenthal are based on the lack of such objective documentation. The court, too, would wish there were a nationally accepted and recognized protocol for questioning child victims of sexual abuse which included obligatory video taping, so that a child could be questioned initially appropriately. Nonetheless, agreement to any such standard may well be impossible, given the nature of the highly emotionally charged nature of the issues involved. Further, an aspect of all such investigations is the infliction of separate and continuing trauma to which the adult world exposes children, making them re-experience extraordinarily troubling events through repeated interviewing by multiple interviewers. Any methodology which would capture the child's information once and permit its review by others over time without the repeated involvement of the already traumatized child would be a boon to all victimized children. It also would avoid issues of contamination, the suggestibility of young children, leading questions, and the rehearsal and performance expectation concerns to which Dr. Sgroi testified. Such a protocol would ultimately lend greater credibility to the words of traumatized children.
Such speculation about helpful methodologies to avoid some of the troubling issues presented by child sexual abuse cases does not alter the reality of Carissa and Joao's experience and those of other children like them. For the fact remains that such sexual abuse allegations have a tremendous impact on the lives of the children, their families and the children's future. Such a result remains true whether or not the allegations are judged by those in positions of authority to be accurate, and more to the point, to identify the perpetrator. CT Page 6044
While the court has great respect for the work of Dr. Sgroi and her influential contributions to the field of child sexual abuse, the court is not limited to accepting only those allegations which are corroborated by others. The court may consider circumstantial evidence and the inferences reasonably supported by that evidence in finding the facts in the case before it. As has been stated in the context of criminal cases, where the burden of proof is somewhat greater than the "clear and convincing" standard in termination matters:
 "There is no legal distinction between direct and circumstantial evidence as far as probative force is concerned. . . . . . . .
 "It is the right and duty of the trier of fact to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door. . . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience in the affairs of life, but, on the contrary, to apply them to the facts at hand, to the end that their action may be intelligent and the conclusions correct." (internal citations and quotation marks omitted.) State v. Chapman, 46 Conn. App. 24, 698 A.2d 347 (1997) quoting State v. Cintron, 39 Conn. App. 110, 118-119, 665 A.2d 95, (1995).
The court concludes that there is clear and convincing evidence that David K. sexually abused his daughter, Carissa, and that it is highly probable that he did so on more than one occasion. The court finds, as supported by Dr. Leventhal's opinions, that the articulate descriptions of the abuse, the distinctions the child made between what her uncle did to her and what her father did, all add to the credibility to be given to her accusations. The evidence is less clear as to Joao. What is without question was that Joao, like Carissa, was exposed to a chaotic and abusive home life with exposure to adult sexuality, if not direct sexual abuse, and the court so concludes from the clear and convincing evidence.
(D) Failure to Rehabilitate
The petitioner has also alleged that David K. has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in CT Page 6045 the life of his daughter, Carissa. The yardstick by which such rehabilitation is measured is in part established by the expectations set for a parent at the initial hearings.[8] The expectations were ordered on September 6, 1995, although interim expectations had previously been established. In addition to the customary expectations of keeping his whereabouts known to DCF, to visit with the children as DCF permits, it was expected that he receive counseling around the allegations of sexual abuse, parenting, drug and alcohol use and also individual and family counseling. Counseling and treatment was to be with a single provider of his own choosing. There was to be no further involvement with the criminal justice system and David K. was to secure and maintain adequate housing and income.[9] There is no question that David consistently and regularly visited with both children to the extent to which he was permitted. At the time of the entry of the expectations, the children were still in his physical care. While there is some evidence of individual counseling, there have remained since that time serious questions about his completion of any drug and alcohol treatment. David K., after some rescheduling, did attend an evaluation in 1995 arranged for him by DCF, but since that date there has been continued evidence of his continued intoxication and prescription drug abuse. It is clear that he did not comply with any recommendations made or attend any twelve-step or other group programs to help him maintain sobriety. In June 1, 1997, he was arrested while sleeping in a garage on premises where his mother rented an apartment as the landlord did not want him there. The police officer who arrested him testified to the littered beer cans surrounding him and his disorientation at that time. David K. has previously acknowledged his alcohol addiction and the fact that he received in-patient alcohol treatment in 1984 and 1993, when he entered detoxification programs.
David has also had a long standing problem with prescription drug abuse in combination with alcohol intoxication. He has had episodes in past years and current events show that he has continued to mix his psychotropic medications with alcohol with disastrous results.[10] The records disclose two emergency room visits and brief hospital admissions from such events in 1997 and 1998. The most recent such admission in 1998 resulted in his incarceration on pending allegations for violation of the terms of his probation.
Another problem has been his ongoing inability to find and maintain adequate employment and housing. He has a tenth grade CT Page 6046 education and has only sporadically been employed with long periods of unemployment. At his present age of thirty-five years, he has not yet begun to lead the life of an independent adult, depending often on his mother or other relatives for housing. But his failure to comply with the spirit as well as the letter of the expectations only compounds his present difficulties, as his criminal conviction and resulting no contact order make it impossible for him to be able to care for his children in the reasonably foreseeable future.
Based on all of the foregoing, the court concludes from the clear and convincing evidence before it that David K. has failed to rehabilitate so that it would be reasonable to expect him to provide for Carissa in the foreseeable future.
2. The putative biological father of Joao, Zegham K.
The evidence about the putative father of Joao disclosed that Zegham K. has only once contacted DCF about his child. Since March of 1995, he has not inquired about Joao's welfare, written to him, paid support or provided funds for his care. He has never seen Joao and has never been involved in his life.
3. Services Provided
Many services were provided to the family, initially community services to the mother to prevent the removal of the children from the home. At the time of the Probate Court proceedings, David K. had initiated individual counseling and continued with that individual counseling for a considerable period of time on a regular basis. In 1995, DCF referred him to West Haven Mental Health for a substance abuse evaluation and additional individual counseling. He completed that evaluation after some initial failure to participate, but has not had any further treatment as recommended by them. He has not attended any twelve step or other group addiction programs to help him maintain sobriety. He was also referred to Meriden Hospital for a sexual offender evaluation after Carissa's allegations were made. He refused to take part in the evaluation or any further treatment which might have been recommended, denying the child's allegations and his need for any treatment. He was provided case management services by DCF, visitation, bus passes for visitation and transportation of the children to his residence when visitation was scheduled there. In addition, DCF referred him to community resources for housing and other financial assistance. CT Page 6047
Such a listing of services does not provide a full view or understanding of how and. under what circumstances the services offered could have led to reunification with the two children. Underlying all of the issues is David K.'s long standing alcohol addiction. His simply participating in a drug and alcohol abuse evaluation without more effort on his part to complete follow-up treatment is woefully inadequate for reunification purposes. Nor can DCF offer services to an unwilling participant, which for the most part David has been. His failure to make progress regarding his addictions up to his most recent incarceration in January of 1998 is self-evident. His failure to participate in a sexual abuse evaluation and any further counseling that might have been recommended, had an evaluation been concluded, is further evidence of his unwillingness to undertake the personal changes required for him to regain the children.
2. ADJUDICATION
Based on clear and convincing evidence, the court concludes that David K. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Carissa, he could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B). Carissa was adjudicated an uncared-for child on September 6, 1995, and has been in foster care since January of 1995, more than three years. As of the date of the filing of the termination petition on April 18, 1997, David K. was not ready to resume her care. Since that time, events have overtaken him and he is less able to do so now than he was then. Further the court concludes from the evidence that the circumstances giving rise to his failure to rehabilitate had existed for well more than a year prior to the filing of the termination petition. His inability to come to terms with his alcohol and drug dependency and to deal with the substantial issues both had raised in his life are long standing and will require significant determination on his part to overcome, determination that has not yet reflected itself in his actions or outlook.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, CT Page 6048474 A.2d 1259 (1984). David K. has been unable to achieve such restoration and will not be able to do so in the foreseeable future.
The court, for the reasons previously stated, concludes from the clear and convincing evidence that David K., by sexually abusing his daughter, had committed acts of commission as defined by the statutory terms. Such acts had occurred more than a year prior to the filing of the termination petition. As to his treatment of Joao, as he is not the biological parent, it is unnecessary to make the same finding except to state that if it were necessary, the evidence supports such a finding as to Joao as well, as previously found. Both children have suffered emotional and physical injury from David K. "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S.,29 Conn. App. 600, 614, 616 A.2d 1161 (1992). See also In re Theresa S.,196 Conn. 18, 25-27, 491 A.2d 355 (1985); In re Sean H.,24 Conn. App. 135, 144-145, 586 A.2d 1171, cert denied, 218 Conn. 904,588 A.2d 1078 (1991). David K.'s sexual abuse of Carissa not only caused her physical injury, but great emotional damage which continues to require treatment at the present time and is likely to require treatment in the years to come.
The court also finds by clear and convincing evidence all three grounds alleged against Zegham K. have been proven by DCF. The first of those grounds, abandonment, focuses on the parent's conduct. In Re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In Re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In Re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In Re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). Zegham K. has not pursued visitation with Joao, has not displayed love, affection or concern for him and has abandoned him completely.
Zegham K. also has no ongoing relationship with Joao. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In Re Midaglia M., 6 Conn. App. 194, 211,504 A.2d 532 (1986); In Re Juvenile Appeal (84-3), 1 Conn. App. 463, CT Page 6049473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984);In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 670-671,420 A.2d 875 (1979). That question is clearly answered by the clear and convincing evidence before the court. The relationship between Joao and his putative father never came into being and Zegham K. has done nothing to establish it. There is no reason to believe that there is any future hope for such action on his part. That there had been no rehabilitation on the basis of these findings is also a foregone conclusion and the court so finds by the clear and convincing evidence. The court finds as to Zegham K. that all three grounds have existed for substantially more than one year prior to the filing of the termination petitions on April 18, 1997.
The court finds, from the clear and convincing evidence, that the three grounds alleged against Zegham K. had existed for more than a year prior to the commencement of the termination petition. Due to this putative parent's unavailability, no efforts at reunification were made and the court finds that they could not have been expected to have been made, based on these findings. To have done so would have been a futile act, which the law does not require. "The law does not require the doing of a useless thing." Corsino v. Grover, 148 Conn. 299, 308, A.2d (1961), Federal Finance Co. v. Forman Properties, Inc.,135 Conn. 153, 158 62 A.2d 516 (1948).
3. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were offered by the Department of Children and Families, including alcohol, drug and sexual offender evaluation and treatment, counseling, visitation and transportation assistance, referrals for housing assistance and parenting classes. As previously found with the exception of visitation and individual counseling, David K. did not participate in or access services which would have permitted him to overcome his alcoholism. No services were offered to Zegham K. as he has never been available.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far CT Page 6050 as possible. No efforts were made as to Zegham K. as to do so would be futile. David K. and prior to her death, Bunnie D., had the benefit of years of services by the time of the filing of the termination petitions. David K.'s failure to seriously address his alcohol addiction, his arrest and incarceration made reunification impossible.
3) The Department entered into reasonable and realistic court expectations in order to reunify the family. None were set for Zegham K. as he never sought to participate. Those set for David K. were reasonable and realistic, but he remained unable to fully comply with them.
4) Carissa has strong emotional ties with her foster family. At the commencement of the trial, Joao had just been moved to that home. He is closely attached to his sister and was overjoyed to be with her again. The foster mother in her testimony outlined the many steps she and her husband have taken to help stabilize Carissa, who has been with them for almost a year. They plan to do their best for Joao as well. Joao has no connection to Zegham K., who has never been involved with this young boy. Both children no longer speak of David K. nor ask about him. They also know that their mother is deceased.
5) Finding regarding the ages of the children. Carissa is seven and Joao will be six in September.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (a) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the children. Zegham K. has done nothing to adjust his circumstances to make it in the best interests of Joao to be returned to him. David K. has taken only a few steps. While it is clear he believes he loves the two children and cares about their future, he has been unable to address his alcoholism, drug dependency and other issues which prevent him from leading an independent adult life. When the terms of his no-contact order expire, it will be far too late for these two children, who need permanency now. CT Page 6051
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. DCF has taken many steps to encourage David K. to have a meaningful relationship with the children and to rehabilitate himself, which he has been unable to accomplish within a reasonable time. His continued visitation permitted him to inflict further injury on the children and since December of 1996, all contact has ceased. As to Zegham K., DCF has taken all reasonable steps, given his unavailability.
4. THE BEST INTERESTS OF THE CHILDREN
Recently, Carissa and Joao have been reunited in the foster home in which Carissa was placed in June of 1997. Carissa has flourished there. She is performing well in school, is a motivated student and with continued counseling, her troublesome behaviors have lessened. The caseworker and foster mother report that she is happy in her placement and wished to remain there. It is too soon to know whether Joao's adjustment will be as successful as his sister's, but her presence in the foster home and her progress should be positive forces for his future there.
In the past, David had offered his mother, Lee C., as a resource for the two children. She has often cared for them, was close to them and has had visitation with them up to the present time. Ms. C. testified on behalf of her son and stated that she presently has guardianship of two other grandchildren, now ages fourteen and eleven, the children of her daughter. She stated that she loves and cares for Carissa and Joao, but believes that if they are in a home where they are content, happy and flourishing, she will not disrupt such a placement. She did not seek a transfer of guardianship. Following her testimony, the pending motion made on her behalf by her son was withdrawn as was the motion for revocation of the children's commitment to DCF.
Several of the children's treatment providers have testified concerning the children's need for permanency. Ms. Slotkin indicated that she concluded their need for permanency was urgent in late 1996, a year and a half ago. Dr. Leventhal's testimony only served to highlight that urgency and their need for permanency now so that each can begin to trust in the continuity of their caretakers and begin to establish the permanent bonds necessary for their healthy emotional development.
That the children have been without permanency and stability for too long is a fact of their short lives that cannot be CT Page 6052 undone. "A child's sense of time is based on the urgency of his or her instinctual and emotional needs and thus differs from an adult's sense of time, as adults are better able to anticipate the future and thus to manage delay." JOSEPH GOLDSTEIN, ET AL.,BEYOND THE BEST INTERESTS OF THE CHILD 98, 99 (1979). "Also, the, significance of parental absences depends upon their duration, frequency and the developmental time during which they occur. The younger the child, the shorter is the interval before a leave-taking will be experienced as a permanent loss accompanied by feelings of helplessness and profound deprivation. Since a child's sense of time is directly related to his capacity to cope with breaches in continuity, it becomes a factor in determining if, when and with what urgency the law should act." Ibid, p. 42. For these children, the law has taken an extraordinary length of time to provide them with only the illusion of stability and they are exhibiting the effects of this uncertainty. Their multiple foster home placements and in particular Joao's sense of betrayal and loss of trust, to which his therapist testified, should end.
The court concludes, based on all the evidence, that termination is in the best interests of Carissa and Joao. Accordingly, a termination of the parental rights of David K. to Carissa and of Zegham K. to Joao is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for the children for the purpose of securing adoptive families and permanent placements for them. If their present foster parents remain willing to adopt the children, it is the court's direction that they be given first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session
[2] Although the last names of the biological fathers begin with the same initial letter, they do not share the same last name and are not related.
[3] Foster father notes, Petitioner's Exhibit 6.
[4] Report prepared by Ms. Freudenthal dated June 27, 1995, Petitioner's Exhibit 3.
CT Page 6053
[5] Respondent's Exhibit D dated July 20, 1995.
[6] Report of Ms. Slotkin, Petitioners Exhibit 7, November 15, 1996.
[7] Hospital of St. Raphael, Progress Notes, December 2, 1996, Petitioner's Exhibit 5B.
[8] The court is aware that full compliance with the court expectations is not necessarily required for a finding of rehabilitation. In re Migdalia M., 6 Conn. App. 194, 206,504 A.2d 532 (1986), see also In re Juvenile Appeal (Docket No. 10118),188 Conn. 259, 263 n. 4 449 A.2d 165 (1982).
[9] Expectations dated 9/6/95, Petitioners's Exhibit 1.
[10] Petitioner's Exhibit 23, Milford Hospital records show acute alcohol intoxication, poisoning by benzoidiazephine based tranquillizer for an admission on 9/18/97, Petitioner's Exhibit 22 documents an admission at Yale New Haven Hospital for an overdose, suicide attempt and alcohol intoxication.